## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KRISTEN A. ROBINSON,                    :
                                        :
          Plaintiff,                    :
                                        :
     v.                                 :   Civil Action No. 05-0358 (JR)
                                        :
ANN M. VENEMAN, Secretary, U.S.         :
Department of Agriculture, *et*         :
*al.*,                                  :
                                        :
          Defendants.                   :

### MEMORANDUM

　　　　Plaintiff Kristen A. Robinson sues the Secretary of
Agriculture under the Rehabilitation Act of 1973, 29 U.S.C.
§§ 791 & 794, for discrimination based on her disabilities --
endometriosis, gastritis, and irritable bowel syndrome.  The
Agency moves for summary judgment.  For the reasons stated below,
that motion will be granted and summary judgment will be entered
for the defendant.

### Background[1]

　　　　Kristen Robinson began working for the Department of
Agriculture's Food and Safety Inspection Services in May 1992.
In 1995, she was diagnosed with endometriosis.  The condition

---

[1] Robinson did not file a statement of material facts in
genuine dispute as required under Local Rule 7(h).  I
therefore may view the Agency's statement of material facts as
conceded.  Nevertheless, for purposes of this motion, I have
considered only those facts from the Agency's statement that
are acknowledged in the body of plaintiff's motion or are
easily documented, and have further mined any supporting facts
available from Robinson's affidavit and answers to
interrogatories.

caused her considerable pain, and she quickly used up her accrued leave time.  She joined the Leave Transfer Program and asked for additional leave without pay, which was granted.  In 1999, Robinson was diagnosed with gastritis and irritable bowel syndrome.  These conditions further debilitated her, causing diarrhea, constipation, and pain.  Moreover, the symptoms flared at unpredictable times and were exacerbated by stress. Robinson's illnesses led to numerous absences from work -- in 1997 alone she took 809 hours of leave out of 2,080 total working hours for the year -- and her absences led to considerable friction with her supervisors:

- In February 1998, her supervisor, Dennis O'Malley, denied her request for a "flex schedule" with a "glide," which would have allowed her to arrive at work later than her scheduled starting time and to make up that hour later during the pay period.

- In November 2000, Robinson applied for Vacancy Announcement 001-039, Labor Relations Specialist, which was cancelled before any selection was made. Robinson alleges that a supervisor informed her that she was not being considered for the position due to her medical condition.

- When William Milton, one of Robinson's supervisors, overheard her complain that she "did not understand how some management officials in the agency slept peacefully at night," Milton went to her and reportedly stated, "I'm up here and you're down there; I've been reading the Bible for 15 years and I don't have any problem going to bed at night."  Pl.'s Aff. at 2.  According to Robinson, she left the area of this confrontation but was followed by Milton and had to lock the entrance to her office to prevent further contact with him.  Id.

- In early 2001, as part of an agency reorganization, Robinson's position was reassigned to the Labor and Employee Relations Division, Employee Relations Branch. In a meeting with Ronald Coleman, her new supervisor, Robinson was informed that the Agency viewed her leave practices as abusive. Referring to the fact that Robinson was only working half of her scheduled hours, Coleman stated: "Prepare to retire with half of your salary and get an apartment on Benning Road, because that's all you'll be able to afford on that amount." <u>Id</u>.

Robinson viewed these incidents as harassment. She was also offended by statements of non-supervisory employees. In May 2001, for example, Robinson began bleeding during a staff meeting and stayed afterward to clean her office chair. Kristie Kelm, another employee, asked her what was wrong and, upon learning about the hemorrhage, stated, "It sounds like you need to have a hysterectomy." <u>Id</u>. Robinson took this to be a "derogatory statement." Pl.'s Opp. Mem. at 3. On another occasion, Ms. Lynn Dickey, a former supervisor, stated, "Don't come to work dressed so well, it bothers me. I don't know why it bothers me, but it bothers me." Pl.'s Resp. to Interrogatories at 27. Robinson viewed this as harassment.

Robinson was also concerned that her private medical information, which she had provided to her supervisors to support her requests for leave, was not being adequately protected. Ms. Dickey, for example, called Robinson into her office and said that she had done some research into endometriosis and that Robinson might want to consider the Leave Transfer Program,

- 3 -

adding that she would be willing to donate leave to her through this mechanism.  Id. at 30-31.  Robinson did not believe that Dickey should have known as much as she did about her condition. Ms. Patti Schulke, a human resources official, pulled Robinson aside one day to ask about her health.  Although the two had spoken of her health issues before, it became clear to Robinson during the conversation that Schulke knew more about her conditions than she had personally told her.  She found this conversation "strange and invasive."  Id. at 31.

In June and July 2001, Robinson requested leave without pay on several occasions, but Coleman, her supervisor, denied the leave for "failure to follow work procedures," and "work volume exceeds manpower."  Def.'s Statement of Material Facts at 3.  At the time, Robinson had a leave balance of negative 5 hours of annual leave and negative 234 hours of sick leave, and much of this leave occurred from 7:30 a.m. to 8:30 a.m. due to commuting problems.  Id. at 2-3.

In November 2001, Robinson requested permission to use the 4/10 Alternative Work Schedule, in which employees work four days per week of ten hours each, yielding one day off per week. To accommodate her request, Robinson was detailed to a different office within the Agency that allowed employees to utilize more flexible schedules, and in January 2002 that office approved her request to work from home one day per week.  In May 2003,

Robinson began working at home more than one day per week, and by August of that year, she was working at home multiple days per week.

In November 2003, Robinson applied for a promotion to the position of Program Analyst, GS-9, which she was awarded in March 2004.  That same month, the Agency officially approved her request to work from home every day.  Robinson stayed at this position until September 2004, when she applied for and received disability retirement.

### Standard of Review

Summary judgment is to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the court must draw all reasonable inferences in the nonmoving party's favor and accept the evidence of the nonmoving party as true.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, in proffering evidence to defeat a motion for summary judgment, the nonmoving party cannot simply rely on conclusory statements or allegations.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must come forward with specific facts that, when viewed in the context of the

record as a whole, could lead a rational jury to find for that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

## Analysis

Robinson's complaint contains two theories of recovery under the Rehabilitation Act:  hostile work environment and constructive discharge.  Because the facts, viewed in the light most favorable to the plaintiff, do not support either theory, summary judgment will be entered for the Agency.

## 1.  Hostile work environment claim

Robinson does not base her discrimination claim on any one of the aforementioned acts or comments of Agency employees. Had she done so, she would have faced a statute of limitations problem, because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred."  <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).  Rather, she claims that the statements and actions of her supervisors and colleagues created an ongoing hostile working environment that was discriminatory based on her disabilities.

Determining whether a work environment is sufficiently hostile to support a Title VII claim requires an examination of "all the circumstances, including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id</u>. at 116.  In conducting this analysis, the Supreme Court has emphasized that Title VII is not a "general civility code" meant to protect employees from "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [protected class]-related jokes, and occasional teasing." <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 787-88 (1998). Rather, a workplace becomes "hostile" for Title VII purposes only when it is "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment...." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82 (1998).

As a preliminary matter, it is not clear that Robinson has demonstrated that any of the acts described in her complaint were motivated by animus toward her <u>disability</u>, as opposed to the massive amounts of leave she had taken since her diagnosis.  Her supervisors' skepticism of her reasons for the amount of leave she was taking -- almost half the entire working year of 1997 -- and the timing of the leave, which often coincided with rush hour, does not, on its face, suggest a discriminatory intent. Moreover, at least one of the episodes Robinson recounts, the conversation with Ms. Dickey in which Dickey offered to donate

her own leave to Robinson, actually reflects <u>positive</u> efforts by the employees of the Agency to understand and accommodate her condition.

        But even without this hurdle, a reasonable jury could not find that the facts alleged in the complaint and supported in the affidavits and interrogatories add up to a hostile work environment.  They consist of a few disagreements with supervisors over their policing of Robinson's leave requests and positive suggestions by colleagues that demonstrated that they knew too much about the details of her condition (which, given her prolonged absences, would surely have aroused innocent attention).  Conspicuously absent from Robinson's complaint is any actual insulting or derogatory reference to her medical problems by supervisors or colleagues.  The alleged events were not frequent or pervasive, as they encompass a few statements and incidents in twelve years of employment (nine after her first diagnosis).  They never included threats of violence or incidents of humiliation, much less disability-related humiliation.  They did not appear to impair her ability to do her job, as she was promoted within the agency despite working from home at least one day per week.  And they are more than balanced by the actions the agency took to accommodate her, including detailing her to an office with flexible leave policies and granting her the ability to work from home, a right she enjoyed for almost two years.  I

am at a loss to understand what could be so hostile as to be actionable under the Rehabilitation Act about a work environment consisting mostly of one's home.  In any event, it would be clear to any reasonable jury that Robinson's problems were no more than the "ordinary tribulations of the workplace," Faragher, 524 U.S. at 787-88, rather than examples of an environment "permeated with discriminatory intimidation, ridicule, and insult." Oncale, 523 U.S. at 81-82.

## 2.  Constructive discharge claim

Robinson also alleges that she was constructively discharged when she resigned from her position due to the hostile environment she faced.  A resignation is actionable as a constructive discharge when "the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 130 (2004).  This test requires "an aggravated case of...a hostile working environment ." Id. at 131.  In other words, there must be "aggravating factors" forcing the employee to leave even beyond the existence of discrimination before a finding can be made of constructive discharge. Dashnaw v. Pena, 12 F.3d 1112, 1115 (D.C. Cir. 1994).

Robinson's constructive discharge claim fails for the same reason as her hostile environment claim -- the record contains no evidence of a pervasively hostile or abusive work

environment, much less the aggravating factors above and beyond a discrimination finding that would have forced her to retire.  At the time of her retirement, Robinson was working at home.  In her deposition, she stated that she believed that the Agency, by granting her the right to work full-time at home, "had done enough" to accommodate her, and there was nothing else the agency could have done to assist her in performing her job.  Pl. Dep. at 216.  She thus retired at the point when she was most free of the supposedly hostile office environment, and was most accommodated with her work-at-home schedule.  She cannot claim that the hostile office environment is what forced her to leave.  See Taylor v. FDIC, 56 F.3d 1497, 1505 (D.C. Cir. 1995) (upholding district court's finding of inadequate evidence to show constructive discharge where plaintiffs did not suggest that the alleged conduct increased around the time of retirement).

## Conclusion

The copious leave and flexible arrangements required by Robinson's unfortunate medical conditions obviously complicated her relationship with the Agency.  She has submitting nothing that would allow a reasonable jury to conclude that she faced a hostile work environment based on those conditions, however, much

less one so extreme as to necessitate her retirement.  An

appropriate order accompanies this memorandum.


                                   JAMES ROBERTSON
                              United States District Judge